CITY COUNCIL OF THE CITY OF RENO, STATE OF NEVADA, Appellant, v. RICHARD D. IRVINE, Respondent.

No. 16810

June 26, 1986

721 P.2d 371

*Robert L. Van Wagoner,* City Attorney, *Tudor Chirila,* Senior Assistant, Reno, for Appellant.

*Raggio, Wooster & Lindell,* for Respondent.

## OPINION

By the Court, SPRINGER, J.:

The City of Reno brings this appeal because the district court

has commanded it to issue a cabaret license[1] for *"Le Cabaret,"* proposed to be operated by respondent Irvine next door to his Virginia Street Adult Book Store, which features an "X-rated 8 channel private video arcade" known to display on video screens unadorned homosexual and heterosexual activities.

The city refused to grant the license because it was "contrary to public welfare." We hold that the Reno City Council acted well within its powers in denying the license and reverse the order of the district court commanding issuance of the license.

Irvine seeks a license to operate a cabaret, that is, a license which permits "singing, dancing, floor show and other live entertainment . . . in [an] establishment where alcoholic beverages are sold. . . ." R.M.C. § 4.06.290. Such licenses are authorized by the municipal code only when they are in harmony with the "general welfare of the inhabitants of the city." R.M.C. § 4.06.020.

The municipal code gives the council broad discretion in granting this kind of license, and as a general rule the courts will not interfere with such discretion. Gragson v. Toco, 90 Nev. 131, 520 P.2d 616 (1974). An exception to this general rule can be found in cases in which the council acts arbitrarily or capriciously. *Gragson* at p. 133; Henderson v. Henderson Auto, 77 Nev. 118, 359 P.2d 743 (1961).

The city council certainly has the general power to determine whether the granting of this kind of license privilege is contrary to the general welfare of the inhabitants of the city. The courts, as a general rule, have no business telling a city board who should or who should not be granted this kind of license or which cabaret licenses would be and which cabaret licenses would not be contrary to the public welfare. Only rarely may a court interfere with such a decision of a municipality's governing board, and then only when it can be demonstrated by the one seeking the privilege that the governing board is acting outside of its legal powers.

If one seeking such a privilege can show that the city board, in denying the license, acted in a manner that was arbitrary (baseless, despotic)[2] or capricious (caprice: "a sudden turn of mind

---

[1]Reno Municipal Code Section 4.06.290 provides:

Sec. 4.06.290. Cabaret licenses.

It shall be unlawful for any person to permit any singing, dancing, floor show or other live entertainment to be conducted or carried on in any establishment where alcoholic beverages are sold in the city without first obtaining a cabaret license. Such a license will be subject to revocation if it appears to the satisfaction of the council that the singing, dancing or entertainment unreasonably disturbs any person in any adjoining room or building or neighborhood.

[2]The Oxford Universal Dictionary.

without apparent motive; a freak, whim, mere fancy")[3] then the board is said to be abusing its discretion and is not acting within its legally delegated powers. Such illegal actions on the part of a city's governing board may be subject to judicial action to prevent interference with a license applicant's legal or constitutional rights.

If a municipal governing body decides to deny a license, even of the highly privileged kind involved here, in an arbitrary and capricious manner, it has abused its discretion and invited judicial review. As stated in *Henderson,* the license applicant has the burden of demonstrating the impropriety of governmental action and is required before the trial court "to establish abuse of discretion on the part of the city council in the denial by that body" of the application. *Henderson,* 77 Nev. at 122, 359 P.2d at 745. Interference by the court is not warranted "except where there [is] a manifest abuse of discretion." 77 Nev. at 122; 359 P.2d at 745. The question here, then, is whether Irvine has sustained his burden before the trial court of proving a manifest abuse of discretion by way of establishing the groundless, arbitrary or capricious action of the city council in denying the license. It is clear that Irvine has not sustained this burden and that the trial court has erred in commanding the council to issue a license.

A city board acts arbitrarily and capriciously when it denies a license without any reason for doing so. In previous cases, *e.g., Henderson,* we have spoken in terms of there being a "lack of substantial evidence[4] before the council" (77 Nev. at 122); but

---

[3]*Idem.*

[4]Expressions like "lack of substantial evidence," "arbitrary and capricious," "sufficient reason," and "abuse of discretion" recur throughout these cases at the administrative, district court and appellate levels. They are useful in describing the need for local governmental decision to be made on a rational basis. City charters grant a very broad discretion to city boards in granting or denying licenses and permits; but this discretion is not totally without limits. City boards may not, for example, deny an application for no reason at all (arbitrarily) or for an improper reason (discriminatory, *e.g.*). When they do, they are said to have "abused" their discretion. Thus, when an applicant can persuade the district court that there is "no substantial evidence" to support a denial decision or simply that there is no reason for the denial, the district court may order the license or permit to be issued (there being no reason why it should not) or may remand to the city authority for further proceedings. Given the foregoing, given the presumption of propriety of the governmental action, and given the heavy burden placed upon a disappointed applicant, there is no legal requirement that a city board "explain" a denial or that it expressly state or enumerate "grounds" in the administrative record. The more, however, that the city board can set forth, in its record, straightforward reasons and grounds for the decision, the less likely is a court to interfere with the normal course of city business.

the essence of the abuse of discretion, of the arbitrariness or capriciousness of governmental action in denying a license application, is most often found in an apparent absence of any grounds or reasons for the decision. "We did it just because we did it."

A perfect example of this kind of groundless, arbitrary denial can be found in the case of County of Clark v. Atlantic Seafoods, 96 Nev. 608, 615 P.2d 233 (1980).

The owner of Atlantic Seafoods sought a license to sell packages of wine or beer to his seafood customers. Clark County said "no" and gave no reason. The trial court ordered that the license be issued because, there being no evidence or apparent reason to support the denial, the board's exercise of discretion was capricious and arbitrary.

On appeal the county argued that Atlantic's being a fish market was sufficient reason to deny its application for a license. This court affirmed, holding that the county board's decision must be related to the public welfare and not arbitrary and capricious. We noted that the mere

> fact that Atlantic is a fish market has no bearing on the public health and welfare. Atlantic Seafood appears to be an appropriate place to sell wine and beer. *The county has not affirmatively explained how the denial promotes the public welfare or why Atlantic would be an inappropriate licensee.* Consequently, the denial was a clear abuse of discretion because it was not based on any good and sufficient reason related to the public's well being.[5]

(Our emphasis.)

*Henderson* is another example of a case in which the trial court ruled that where there is no evidence or reason found in the record of the licensing proceedings to support a license denial, the license must be issued. These cases do not stand for the proposition that the board must "explain" its decision or even that it must make formal findings or conclusions. The decision of the trial court in these matters must, rather, be based upon the applicant's ability to establish in some manner that the council has abused its discretion. This may be done, as it was in *Seafoods* and *Henderson* by showing that the municipal record discloses no sufficient reason to support the denial.

---

[5]The emphasized sentence, it should be mentioned, refers to the county's burden as appellant to demonstrate error by explaining to this court why granting a package beer and wine license to a fish market was contrary to the public interest. It does not mean that the licensing board had any burden to explain its action at the administrative or district court level. As stated, the applicant has the burden of establishing before the council and the trial court any claimed abuse of discretion on the part of the board.

We have recently had occasion to apply these principles in a zoning case, City Council, Reno v. Travelers Hotel, 100 Nev. 436, 683 P.2d 960 (1984), Travelers Hotel sought a special use permit to build a 305-room hotel-casino complex. The planning commission recommended issuance of the permit. No objections were made to issuance of the permit at the public hearing. At the hearing before the council testimony was limited to one witness who testified that she thought the project was too close to a high school. The trial court found that the denial under these circumstances "was an abuse of discretion and not supported by substantial evidence."

This court upheld the trial court in *Travelers*, noting that the mere statements of interested parties and their counsel and the opinions of council members did not provide a proper reason for the decision. In coming to this conclusion we cited with approval language from *Henderson* which declared the above-discussed principles relating to the nature of judicial intervention in license denial cases.

When we look at the record presented to the trial court in this case, we find a set of circumstances clearly distinguishable from that found in *Seafoods, Henderson,* and *Travelers.* In this case we find an abundance of reasons in the record to support denial of the license.

As part of the licensing process the application was referred to the police department for study and recommendations. Because of the proximity to the X-rated book and movie operation and other reasons stated in the police report the police recommended granting the license only upon the imposition of certain conditions. These conditions included: a condition prohibiting the cabaret from "expanding" into the X-rated business by way of common doors and such; a condition stating that "[d]ue to its location, one-half block from residential dwellings, noise from music, disc jockey, band, etc. [should] be kept at an acceptable level;" a condition that personnel of the two businesses not be "allowed to intermingle back and forth between the two businesses;" a condition that the X-rated business not advertise its wares in *Le Cabaret;* and a condition that *Le Cabaret* not allow its drinks to be carried to the X-rated business. Five other more general restrictions and conditions were also imposed.

In reviewing council deliberations it appears that council members were concerned about the obvious: the inherent difficulties in enforcing the mentioned police conditions. As put by Councilman Nunez: "I don't know how we are going to enforce those things in a lot of cases." As an example of the type of enforcement problem mentioned by the councilman, one can see that it

would be difficult indeed to try to prohibit the sex shop's advertising to *Le Cabaret* patrons as it would be impossible to enter *Le Cabaret* without seeing the advertising on the outside of the X-rated business next door.

Councilman Nunez and other members of the council had good and sufficient cause to conclude that a combination of factors including the very close association of the two operations, the need to monitor the noise level, the likelihood of personnel from one being involved as personnel for the other, and the expectation of patrons taking drinks from the cabaret to the book store and sex-movie pavilion would create a situation that would be inconsistent with the general welfare of the public.

It would appear to be an uphill struggle indeed for Irvine to show that the city council was being whimsical when the City denied to him the privilege of engaging in abutting pornography[6] and dance hall operations. No person, including Irvine, spoke or requested to speak at the hearing in support of the creation of such a menage. If there were nothing before the council but the one fact—putting dancing and drinking next to an "adult" book and X-rated video arcade—the courts would be hard-pressed to conclude that denial of such a scheme was beyond government powers or was an act of arbitrariness or capriciousness on the part of the governmental body.

In addition to the above-stated combination of reasons, the necessity of burdensome enforcement of the police-imposed conditions provides a separate and independent rational basis for the denial of this cabaret license. Still another discrete and singly supportable reason for denial which can be taken from the record is that the city could have relied on the police department's notation that the cabaret was only one-half block from residential buildings. Absent an affirmative showing that Irvine was being discriminated against, the police department's concern about the cabaret's "location one-half block from residential dwellings [and] noise from the music" and other natural incidents of dance-hall frolicking provide in themselves a rational basis for the denial decision.

Irvine, it appears from the record, did not even make a token showing of arbitrariness or other misfeasance on the part of the Reno board. Absent a showing by Irvine of impropriety on the

---

[6]*Pornography* has been defined as being a "[d]escription of the life, manners, etc., of prostitutes and their patrons; hence the expression or suggestion of obscene or unchaste subjects in literature or art." The Oxford Universal Dictionary. Without giving into the question of whether the written and pictorial depiction of explicit sexual activities comprises what can be called literature or art, we feel quite safe in using the term pornography as above defined.

part of the city council in making its decision to deny the license, the city's decision must be upheld.

In this case the council unanimously concluded that it would be contrary to the public welfare to grant the license. This conclusion was based on good and sufficient reasons appearing in the record. Irvine did not show in any way that the action taken by council was arbitrary, capricious, or in excess of its lawful powers.

MOWBRAY, C. J., and STEFFEN, GUNDERSON, and YOUNG, JJ., concur.